13 P.3d 1065 (2000)
David A. ELLIS, Respondent,
v.
CITY OF SEATTLE, d/b/a Seattle Center, Appellant.
No. 68252-6.
Supreme Court of Washington, En Banc.
Argued June 20, 2000.
Decided December 14, 2000.
As Amended January 8, 2001.
*1066 Jeffrey Lowell Needle and Maria C. Fox, Seattle, Amicus Curiae on behalf of Washington Employment Lawyers Assoc.
Daniel Charles Gallagher and Mitchell Alan Riese, Seattle, for Petitioner.
Leight Ann Collings Tift, Seattle, Hon. Mark Sidran, Seattle City Attorney, and Jeffrey Julius, Asst., Seattle, for Respondent.
TALMADGE, J.
We decide in this case if David Ellis, a sound technician at the Seattle Center's Key Arena who refused to disable a public address (PA) component of the Arena's fire alarm system at his employer's insistence, presented sufficient evidence to get to the jury on his claim of wrongful discharge based on public policy. We hold Ellis presented sufficient evidence to withstand a motion for summary judgment. We reverse the Court of Appeals' decision on wrongful discharge based on public policy and remand that portion of Ellis's case, along with his claim of retaliatory discharge pursuant to RCW 49.17.160, to the King County Superior Court for trial.

ISSUE
Has Ellis presented sufficient evidence to get to a jury on his claim of wrongful discharge as against public policy?

FACTS
David A. Ellis was employed as an intermittent sound technician, a casual employee, at the Seattle Center, an agency of the City of Seattle (City), beginning in September 1995. Ellis has a degree in electrical engineering from the University of Michigan. Before he began working at the Seattle Center, he had over 10 years of experience in the repair, installation, and maintenance of professional audio and video equipment.
After several years of refurbishing, the Key Arena opened at the Seattle Center in late 1995 as the home of the Seattle Supersonics basketball team. The controversy in this case arises from the operation of the fire alarm system at the Key Arena. Upon a *1067 manual or automatic fire alarm being turned in, a three minute delay period occurred. After that interlude, the alarm became audible. By design, this alarm shut off the Arena's PA system. The purpose of shutting off the PA system was to allow the emergency fire microphones located in a separate room at the Arena to become active so emergency officials could give directions to patrons at Key Arena in the event of a fire or other emergency. Thus, Seattle Fire Department personnel could make any necessary crowd control announcements over the PA system without interference from those announcing a game or other activity at Key Arena. Ellis and other sound technicians were specifically told of this system feature by its manufacturer.
Upon the opening of Key Arena, problems ensued with the fire alarm system. The fire alarm system activated near the end of a Sonics basketball game on January 19, 1996, causing the PA system to go off the air, as designed. The sound technician on duty at the time, Matthew Abraham, averred the following:
Within seconds of the PA system being muted, Rob Martin, an official with the Sonics, and Jill Crary, the Events Services Representative (ESR) from Seattle Center, got on the radio and asked what was going on with the PA system and why there was no house sound. I explained to them that it was a function of the fire alarm system mode, and that it was a function of the fire alarm system that the house PA would be cut off, and control over the house PA would be shifted to the emergency fire microphones, for use only by Fire Department officials.
Jill Crary and Rob Martin then told me over the radio to restore the sound, and to do whatever needed to be done. I told them that they were asking me to alter a fire alarm system, and that this was a system approved by the Fire Department, and that it should not be altered without authorization. Crary asked me if I knew how to bypass the relay, and thus restore the house sound. I said yes, I did know how to do it. Rob Martin then got on the radio, and told me to bypass the relay and restore the sound. I said that I needed proper authorization to do so. Martin then said, "I, Rob Martin, give you authorization to bypass the relay." I then told Martin and Crary over the radio that I would try. I then went to the location where the bypass of the relay would have to be performed, but I did not, in fact, attempt to bypass the relay, because I was not sure that the situation was under control and that in fact, the fire alarm was false, and I did not want to interfere with the design of the fire alarm system and risk making the system not operate in the way that it was designed to.
I was also concerned because when Crary first called me on the radio to ask what was going on and why the sound had cut out, and when I explained that we were in a fire alarm mode, Crary said that she had no idea that the Key Arena was even in a fire alarm mode. Then, less than a minute later, Martin was telling me that he was authorizing me to bypass this relay to restore the house PA sound. This made me even more wary of performing the bypass, since both Crary and Martin had indicated by their comments that they did not understand how the fire alarm system worked at Key Arena. Neither Crary nor Martin ever indicated that the Fire Department had given them any authority to authorize me to alter the fire alarm system, and bypass the relay.
Clerk's Papers at 332-33. Abraham reported this incident to Ellis the following night, so Ellis was aware of the controversy arising from orders to bypass the shunt relay.
Two days after this incident, Ellis and Abraham were both working at Key Arena preparing for another Sonics game. A couple of hours before the start of the game, a grease fire in the kitchen caused the fire alarm to go off, again resulting in a loss of the PA system. Jill Crary was again the ESR on duty and she instructed Abraham to bypass the fire relay until the alarm could be reset by fire officials. Abraham asked Crary for written authorization, which she provided by a hand-written note, whereupon Abraham *1068 bypassed the fire relay and reconnected it when Crary told him to do so.[1]
Concerned about potential danger to the public from bypassing the emergency fire microphone relay, as well as the legality of tampering with a fire alarm system, Ellis and Abraham saw their supervisor, Rick Smargiassi, on the following day to express their concerns. Ellis asked Smargiassi to get management involved in the issue. Ellis saw Smargiassi again the very next day to ask if he had done anything about his concerns. Ellis averred:
Smargiassi told me that I had to do whatever I was told to by an event services representative (ESR), such as Jill Crary, even though I believed that tampering with a fire alarm system was illegal. I told Smargiassi that I would be happy to wire around the emergency fire microphone sound relay, as long as I had written authorization or a verbal request from a Fire Department official. I told Smargiassi that I thought that this request from ESRs, who have no training or authority in fire prevention, was not proper. I told Smargiassi that I wanted written clarification on who could, at what time, ask me to bypass the fire relay.
Clerk's Papers at 365-66. Two days later, Smargiassi told Ellis he had conferred with John Cunningham, the Human Resources Manager for Seattle Center.
Smargiassi said that I needed to understand the "chain of authority" at Seattle Center. He said that if one of my superiors asked me to do something, I had to do it, without written authorization, whether or not I believed it to be legal.[[2]] I asked Smargiassi if he had spoken to the Fire Department. He said that he had not. Smargiassi told me that if I was not willing to do whatever I was asked without questioning it, he would have to accept my resignation. I told him that I would not resign, as I had done nothing wrong.
Clerk's Papers at 366. Two days later, at a meeting Smargiassi had called, in the presence of two other intermittent sound technicians and an ESR named Kevin Moore, Ellis said, in response to a question from Smargiassi, *1069 he would not bypass the emergency fire microphone sound relay with only a verbal request from an ESR, and would require "either written authorization from someone above me at Seattle Center or a written or verbal request from someone at the Fire Department or someone at Seattle Center showing me that this request was a legal one." Clerk's Papers at 367. Matt Abraham also insisted on such authorization.
Ellis knew the Seattle Center had not received a blanket authorization from the Seattle Fire Department to bypass the system because he overheard a voice mail message from Jill Crary on January 26 indicating the Center had not received Fire Department approval for the bypass.
On February 2, 1996, John Cunningham summoned Ellis to a fact-finding meeting at which Ellis repeated his insistence on obtaining what he considered proper authorization before bypassing the relay. Ellis and Cunningham give two very different accounts of this meeting. Cunningham claimed Ellis was insubordinate, while Ellis contended he reiterated his willingness to bypass the system upon verbal authorization from the Fire Department or written authorization from Seattle Center management. At the conclusion of the meeting, Cunningham suspended both Ellis and Abraham.
Three days later, Ellis and Abraham complained to the Washington State Department of Labor and Industries (L & I) about being asked to disable part of the fire alarm system. Subsequently, the Seattle Center suspended Abraham for 15 days for insubordination and shortly thereafter accepted his resignation in lieu of discharge. Ellis was discharged by Seattle Center director Virginia Anderson on February 22, 1996, for "gross insubordination." She listed as causes for the termination Ellis's failure to report for a scheduled shift on February 2 and his "stated refusal to comply with a directive from your supervisor." Clerk's Papers at 329. Anderson later admitted during her deposition that Ellis's failure to report for his shift on February 2, standing alone, would probably not have resulted in his termination.
Ellis subsequently sued the City alleging two causes of action, wrongful termination based on public policy, relying on Gardner v. Loomis Armored Inc., 128 Wash.2d 931, 913 P.2d 377 (1996), and retaliatory discharge in violation of RCW 49.17.160(1) stemming from his L & I complaint (Clerk's Papers at 6). RCW 49.17.160(1) is the whistleblower provision of the Washington Industrial Safety and Health Act (WISHA), and provides, in pertinent part: "No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint... related to this chapter." The trial court, the Honorable William Downing, granted the City's motion for summary judgment, dismissing Ellis's entire case. The Court of Appeals thereafter affirmed the trial court's dismissal of the wrongful discharge claim, but reversed the trial court's dismissal of the retaliatory discharge claim. Ellis v. City of Seattle, No. 42334-7-1, 98 Wash.App. 1006, 1999 WL 225057 (Apr. 19, 1999). We granted review of the decision on wrongful discharge. The City has not sought review of the decision on retaliatory discharge.

ANALYSIS
Because this case is here on an appeal from the Court of Appeals' affirmance of summary judgment in favor of the City, the usual rules for reviewing summary judgments apply:
The standard of review on summary judgment is well settled. Review is de novo; the appellate court engages in the same inquiry as the trial court. Benjamin v. Washington State Bar Ass'n, 138 Wash.2d 506, 515, 980 P.2d 742 (1999). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Clements v. Travelers Indem. Co., 121 Wash.2d 243, 249, 850 P.2d 1298 (1993); CR 56(c). All facts submitted and all reasonable inferences from them are to be considered in the light most favorable to the nonmoving party. Clements, 121 Wash.2d at 249, 850 P.2d 1298. "The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." Clements, *1070 121 Wash.2d at 249, 850 P.2d 1298 (citing Wilson v. Steinbach, 98 Wash.2d 434, 656 P.2d 1030 (1982)). However, bare assertions that a genuine material issue exists will not defeat a summary judgment motion in the absence of actual evidence. White v. State, 131 Wash.2d 1, 9, 929 P.2d 396 (1997).
Trimble v. Washington State Univ., 140 Wash.2d 88, 92-93, 993 P.2d 259 (2000). Thus, even where there are facts in dispute, as here, we treat the facts and inferences from the facts in a light most favorable to Ellis.
The Court of Appeals analyzed the sole issue in this case under Gardner, 128 Wash.2d 931, 913 P.2d 377. Both parties agree Gardner controls. Gardner sets forth a four-part test for analyzing wrongful discharge claims involving alleged violations of public policy:
(1) The plaintiffs must prove the existence of a clear public policy (the clarity element).
(2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element).
(3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element).
(4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element).
Id. at 941, 913 P.2d 377 (citations omitted). These elements are conjunctive. Id. at 942, 913 P.2d 377 ("Each of the public policies ... must be scrutinized under this four-part test.").
The Court of Appeals began its analysis with the clarity element. "In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984). Ellis argued because the Seattle Fire Code requires certification from the Fire Department before an individual may service fire alarm systems, and because he had no such certification, the City's prospective orders to him to bypass the system were illegal. The Seattle Fire Code states: "No person shall engage in the business of installing, servicing or maintaining fire and life safety systems and equipment unless they have obtained a certificate from the Chief or are specifically exempted from this section." Seattle Fire Code, App. Ill B, at 496c. Other fire code sections support Ellis's contention.[3] The Court of Appeals agreed with Ellis, and held he met the clarity element of the four-part Gardner test. Ellis, slip op. at 6. The City has not asked us to review this holding.
The Court of Appeals next considered the second element, the jeopardy test: "The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy." The purpose of the jeopardy element is to guarantee "an employer's personnel management decisions will not be challenged unless a public policy is genuinely threatened." Gardner, 128 Wash.2d at 941-42, 913 P.2d 377.
In considering this element of the Gardner analysis there has been some question as to whether a plaintiff must prove an actual violation of the public policy or must simply have an objectively reasonable belief the policy may be violated. Gardner did not address this issue. In two Court of Appeals cases, *1071 Bott v. Rockwell Int'l, 80 Wash.App. 326, 908 P.2d 909 (1996), and Wlasiuk v. Whirlpool Corp., 81 Wash.App. 163, 914 P.2d 102, 932 P.2d 1266 (1996), different divisions of the Court of Appeals held actual violations of law, policy, or regulation were required in situations involving financial misconduct. Cf. Farnam v. CRISTA Ministries, 116 Wash.2d 659, 670-72, 807 P.2d 830 (1991) (employee knew employer's conduct did not violate law; no cause of action).
In the retaliatory discharge context, Washington law has recognized a cause of action where an employee has an objectively reasonable belief an employer has violated the law. See, e.g., RCW 49.60.210 (retaliation for discrimination claim); Kahn v. Salerno, 90 Wash.App. 110, 130, 951 P.2d 321 (1998); Graves v. Department of Game, 76 Wash. App. 705, 712, 887 P.2d 424 (1994). See also RCW 42.40.020(5) (state whistleblower statutegood faith belief improper governmental action); RCW 42.41.040(1) (local whistleblower statute). This standard has an analog in federal antidiscrimination law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). A reasonable belief by the employee, rather than an actual unlawful employment practice, is all that need be proved to establish a retaliation claim. Moyo v. Gomez, 40 F.3d 982, 985 (9th Cir.1994). In fact, to establish his retaliation claim under RCW 49.17.160(1), Ellis is not required to prove an actual WISHA violation. All he has to do is prove the City terminated him for making a WISHA complaint. See Wilson v. City of Monroe, 88 Wash.App. 113, 943 P.2d 1134 (1997).
In the context of concerns regarding public safety where imminent harm is present, we hold the jeopardy prong of the Gardner test may be established if an employee has an objectively reasonable belief the law may be violated in the absence of his or her action. This comports with our holding in Gardner emphasizing the need for swift action to protect human life. We do not, however, at this time disturb the holdings in Bott and Wlasiuk as to situations not involving immediate harm to life and limb.
The conduct in which Ellis engaged here was to refuse prospectively to bypass the disabling of the PA system without what he considered proper authorization or assurance. His motive was protection of the public. Obviously, disabling the fire alarm system so it did not work as it was designed to work would raise safety concerns in the mind of any conscientious individual, especially here, where Ellis knew the Seattle Fire Department specifically designed the disabling feature. Both Ellis and Abraham expressed their concern about safety and legality to their supervisors. Firing Ellis for raising questions about the legality of what he was told to do jeopardizes the public policy of following the fire code mandate to permit only certified persons to work on fire alarm systems.
The City responds by arguing Ellis was not asked to work on the fire alarm system, asserting he was asked only to work on the public address system, a task not requiring certification. The City cites the declaration of Fire Marshal Jerald A. Birt:
Certification, under Section 103.3.5 of the Seattle Fire Code, can be one area of confusion. Although the Fire Code appears to limit work on fire alarm systems to certified persons, the definition of fire alarm system is subject to interpretation. For instance, ventilation fans are a critical part of the smoke control system at the Key Arena, but the persons who install such fans are not certified. Even more difficult to interpret are some of the hybrid systems in which the fire alarm system is incorporated with other traditional systems, such as public address (PA) systems. This is the type of system which exists at the Key Arena. In those instances, if the PA system were deemed to be a "fire alarm system", in reality, no one would ever be able to work on any portion of the PA system under the Code.
Clerk's Papers at 435-36. The Court of Appeals accepted the City's explanation, concluding Ellis's behavior was not necessary to enforce the public policy because the "SFD explained that such certification was not required since Ellis was ordered to work on the *1072 PA system, not the fire protection aspect associated with it." Ellis, slip op. at 7.
We disagree with the Court of Appeals. The automatic disabling of the PA system was an integral part of the design of the fire alarm system at Key Arena. Bypassing the automatic disabling feature of the fire alarm system cannot fairly be characterized as working solely on the PA system. It is certainly not the equivalent of installing ceiling fans. Even more compelling, however, is the fire code's definition of a fire alarm system.
As Fire Marshal Birt averred above, "the definition of fire alarm system is subject to interpretation." The term "fire alarm system" is defined in the Seattle Fire Code:
Fire Alarm System. A system of electrical devices such as flow sensors, heat or smoke detectors which is designed and installed for the purpose of warning building occupants or the Fire Department of a fire or of causing the operations of other fire and life safety equipment. The term shall include associated electrical wiring, power supplies, supervisory and control circuits.
Seattle Fire Code, App. III-B, at 496b. (emphasis added). Bypassing the automatic PA disabling feature of the fire alarm system involved manipulating "associated electrical wiring." Thus, it appears Ellis would have been working on the fire alarm system, as the Seattle Fire Code defines it, had he actually rewired the circuit to avoid automatic disabling of the PA system. Whether the work Ellis was asked to perform involved work on the fire alarm system or purely work on the PA system is a fact question, and should go to a jury for determination.
The Court of Appeals decided against Ellis on the jeopardy element for a second reason. It said Ellis's conduct was unnecessary to enforce the policy of allowing only certified persons to work on fire alarm systems because "such work would be ordered only after the City obtained authorization from the SFD." Ellis, slip op. at 7. The court refers here to several declarations of various fire personnel and Seattle Center officials who averred after the fact and after Ellis had filed his lawsuit they would authorize bypass only after scrutinizing each situation as it came up and making a decision on the scene. Captain Wick, for instance, said at his deposition that in response to inquiries from Seattle Center personnel about bypassing the fire alarm system: "I think II believe my recollection is that I said that if I had the details and at that particular time I felt it was appropriate, I would give them authorization." Clerk's Papers at 218. There is no reason to doubt Captain Wick, but Seattle Center officials never conveyed this information to Ellis, despite his persistent requests for official Fire Department authorization for the bypass. They just fired him for insubordination.
Indeed, Ellis sought through his union representative the Fire Department's position on the propriety of his working on the fire alarm system. In a letter dated January 30, 1996, Captain W.T. Denzel replied as follows:
This is to confirm that the Seattle Fire Code requires that only persons possessing certification to service automatic fire alarm systems perform alterations to existing systems. Alterations to systems should be approved by the Seattle Fire Department Plan Review Section prior to implementation.
Clerk's Papers at 308. This is the information Ellis had when he attended the fact-finding meeting with the Center's human resources manager, Cunningham. Captain Denzel understood what Ellis was being asked to do was an alteration to the system, which indeed it was. Captain Denzel said such alterations require approval before implementation. In short, the Court of Appeals wrongly accepted the City's post hoc rationalization that no one would have asked Ellis to do something the Fire Department had not approved. Ellis did not know that because no City official told him that.[4] In *1073 summary, there are at least two fact issues as to the second prong of the Gardner test, both mandating reversal of the summary judgment.
The Court of Appeals made short shrift of the third element of the four-part Gardner test, causation: "The plaintiffs must prove that the public-policy-linked conduct caused the dismissal." Because the court had rejected the jeopardy element, it concluded Ellis could not prove causation. Ellis, slip op. at 7. We disagree. There is no dispute the City fired Ellis because of his refusal prospectively to alter the fire alarm system. His dismissal letter from Seattle Center Director Anderson specifically referenced his "gross insubordination" with respect to his refusal. Thus, the causation element is established.
The Court of Appeals likewise did not find the fourth element, absence of justification ("The defendant must not be able to offer an overriding justification for the dismissal"), was present because two prior elements of the four-part Gardner test were missing. Ellis, slip op. at 7-8. The City claims Ellis's termination was justified by its overriding concern for public safety. It cites to the statement of a retired SFD engineer, who said that on occasion the PA system might be needed to prevent panic in the Key Arena. It also cites to a statement from Fire Marshal Birt that because of better visibility in the Arena, it might be better to make announcements from that location rather than from the fire control room. But these statements appear to be further post hoc rationalizations and are entirely vitiated by Ellis's assertions from the very beginning that he would always follow the verbal orders of Fire Department personnel. Clerk's Papers at 368 (statement to Cunningham at fact-finding meeting) ("I would do the bypass if I had ... verbal authorization from someone at the Fire Department.").
We find some concern from the record as to the justification element. One City official admitted he did not know, at the time they were disciplined, if Ellis and Abraham were wrong about their safety concerns. Cunningham admitted, at the time he suspended Ellis and recommended firing him, he had no idea of what Captains Wick and Nelson would say about the Fire Department's position on the bypass. He wrote to the Washington State Employment Security Department on April 26, 1996, with respect to Abraham's resignation:
If, in fact, Mr. Abraham was correct in his understanding of the requirements of the statute [that only certified persons could work on fire alarm systems], the dismissal would have been improper and clearly not for good cause. Reaching a finite [he appears to mean definite] determination on the issue would have entailed a lengthy (many months) process leading to arbitration, during which time he would have had to live with a dismissal from employment. He chose to resign instead. As a consequence, no final judicial determination has been made on whether he or the supervisor was correct as to the interpretation of the statute.
Clerk's Papers at 326. Thus, on April 26, 1996, nearly three months after Cunningham suspended Ellis for insubordination, Cunningham states he still did not know whether Ellis was correct in his assertion that rewiring the fire alarm system would have been a violation of the Seattle Fire Code because of his lack of certification. Cunningham's statement here brings into serious doubt the City's post hoc rationalizations. Rather than finding out whether Ellis's concerns were legitimate, the City fired him, and only after he sued did the City attempt to justify its actions by obtaining statements from Fire Department personnel.
In summary, Ellis either meets all four elements of the four-part Gardner test, or factual questions precluding summary judgment exist with respect to the jeopardy and absence of justification elements. The trial court should not have granted summary *1074 judgment to the City on the wrongful discharge cause of action.

CONCLUSION
David Ellis became concerned about the potential danger to human life that might occur if he had to alter the designed operation of the fire alarm system at Key Arena as ordered. His concern is reflected in the Seattle Fire Code, which prohibits uncertified personnel from working on fire alarm systems. Public policy should encourage the safe operation of fire alarm systems, and Ellis was furthering that public policy by refusing, as an uncertified electrician, to work on the fire alarm system to alter the way it was designed to operate, in the absence of authority for doing so. He expressed his concerns to his supervisors, told them he needed either written assurance from non-Fire Department officials or verbal assurance from Fire Department officials that it was proper for him to perform the alterations. The City responded by suspending him for gross insubordination and firing him shortly thereafter. There is no hint in the record, or claim by the City, that Ellis was anything but sincerely conscientious in his concerns, or that there were any other reasons for firing him. In Gardner, we said: "Society places the highest priority on the protection of human life. This fundamental public policy is clearly evidenced by countless statutes and judicial decisions." Gardner, 128 Wash.2d at 944, 913 P.2d 377.
We reverse the Court of Appeals in its affirmance of trial court's summary judgment in favor of the City and remand the case for trial on the issues of wrongful discharge in violation of public policy and retaliatory discharge pursuant to RCW 49.17.160(1).
GUY, C.J., SMITH, JOHNSON, ALEXANDER, IRELAND, and BRIDGE, JJ., concur.
MADSEN, J. (concurring).
The majority holds that "[i]n the context of concerns regarding public safety where imminent harm is present, ... the jeopardy prong of the Gardner test may be established if an employee has an objectively reasonable belief the law may be violated in the absence of his or her action." Majority at 1071. This "reasonable belief standard does not accord with this court's cases addressing the claim for wrongful discharge against public policy. Further, rather than adhering to the admonition that the public policy exception to the terminable at will doctrine is a narrow exception, the majority's approach greatly expands the exception and places this court in the unacceptable position of interfering in day to day business personnel decisions. Moreover, even if one accepts the majority's new reasonable belief standard, I would hold that it is lacking in this case as a matter of law.
The public policy exception to the common law terminable at will doctrine was adopted in Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984). The court there recognized that the exception applies where application of the common law doctrine would lead "to a result clearly inconsistent with a stated public policy and the community interest it advances." Id. at 231, 685 P.2d 1081 (emphasis added). The court also said that "[t]he policy underlying the exception is that the common law doctrine cannot be used to shield an employer's action which otherwise frustrates a clear manifestation of public policy." Id. (emphasis added). Thus, with initial adoption of the public policy exception, this court focused on the employer's action as violating clear public policy.
"The employee has the burden of proving his dismissal violates a clear mandate of public policy." Id. at 232, 685 P.2d 1081. This mandate may be found where the "`employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme'" and where prior judicial decisions established relevant public policy. Id. (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625, 631 (1982)). The court emphasized that this "narrow public policy exception ... properly balances the interest of both the employer and the employee ." Id.
Subsequent cases bear out the Thompson analysis: the focus is on the employer's action, and the exception is a narrow one. In *1075 Dicomes v. State, 113 Wash.2d 612, 782 P.2d 1002 (1989), involving whistleblowing, the court refused to find the public policy exception applied. There, contrary to the plaintiff's belief, there was no violation of statute where certain surplus funds in the Department of Licensing budget were not expended, nor was clear legislative intent contravened. The court noted that the employee was not faced with the choice of violating the law or sacrificing her job; she was instead faced with a difference of opinion, and her "good faith belief in the righteousness of her conduct [was] too tenuous a ground upon which to base a claim for wrongful discharge." Id. at 624, 782 P.2d 1002. Farnam v. CRISTA Ministries, 116 Wash.2d 659, 807 P.2d 830 (1991) also involved alleged wrongful discharge in violation of public policy for whistleblowing. There, the plaintiff had several times acknowledged that her employee had the legal right to remove nasal-gastric feeding tubes from patients under certain circumstances, but argued nonetheless that she could have believed that removal constituted patient abuse in violation of law because the relevant statutes did not specifically include or exclude nasal-gastric feeding tubes as life-sustaining procedures which could be withheld. Id. at 670-71, 807 P.2d 830. The court disagreed, saying that the focus is on the employer's conduct, not the employee's actions. Id.
As in these whistleblowing cases, the focus in a case where it is claimed the employee has been directed to engage in illegal conduct should be on the employer's action. This said, I cannot conceive how an employee can be fired for refusing to engage in illegal conduct unless the employer has directed the employee to actually engage in illegal conduct. The employee's good faith belief cannot render illegal what is not actually illegal.
Just as problematic, where this court steps in and decides that public policy is sufficiently violated based upon the employee's reasonable belief, it interferes in business management and alters the balance of interests that the narrow public policy exception in Thompson preserved. The line between the conscientious employee and the insubordinate employee is not easily drawn in many circumstances. Given that the public policy exception is the exception, not the rule, the terminable at will doctrine should prevail unless there is an actual violation of a clear mandate of public policy.
Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 913 P.2d 377 (1996) is also contrary to the majority's pronouncement of a reasonable belief standard. The four-part test stated there is consistent with prior law requiring identification of a clear mandate of public policy and discharge in violation of that policy. The focus again is on the employer's conductdoes the discharge violate the public policy, in Gardner, the policy encouraging citizens to save persons from life threatening situations. Nowhere does Gardner indicate anything other than actual violation of the policy suffices. To the contrary, Gardner indicates, as do all the court's preceding cases, that the policy itself must be actually violated.
In addition to these cases, as the majority correctly observes, the Court of Appeals has refused to accept the premise that a good faith or reasonable belief suffices. Wlasiuk v. Whirlpool Corp., 81 Wash.App. 163, 179, 914 P.2d 102, 932 P.2d 1266 (1996) ("a plaintiff must show either an actual violation, or that the purpose of the law was violated"); Bott v. Rockwell Int'l, 80 Wash.App. 326, 335-36, 908 P.2d 909 (1996). The court in Bott aptly observed a "good faith" standard undermines this court's "announced policy of protecting against frivolous lawsuits and `allow[ing] trial courts to weed out cases that do not involve any public policy principle....'" Bott, 80 Wash.App. at 336, 908 P.2d 909 (alteration in original) (quoting Thompson, 102 Wash.2d at 232, 685 P.2d 1081).
More importantly, a "good faith" standard undermines the principle "of allowing employers to make personnel decisions without fear of incurring civil liability." Bott, 80 Wash.App. at 336, 908 P.2d 909 (citing Thompson, 102 Wash.2d at 232, 685 P.2d 1081).
The majority's reliance on other employment laws for support of its reasonable belief standard is misplaced. For example, the majority notes that the state whistleblower statute contains a good faith belief standard. *1076 Majority at 1071 (citing RCW 42.40.020(5)). This reliance highlights the fundamental error of the majority. It is one thing for the Legislature to implement a good faith standard. It is quite another thing for this court to do so in the context of the public policy exception to the terminable at will rule.
In my view this court should join other courts that have declined to extend the public policy exception to situations where the employee alleges a reasonable belief that he or she is being directed to engage in illegal conduct in violation of public policy. See, e.g., Antley v. Shepherd, 340 S.C. 541, 549, 532 S.E.2d 294 (Ct.App.2000); Ran Ken, Inc. v. Schlapper, 963 S.W.2d 102 (Texas App. 1998).
However, even if one accepts the majority's expansion of the public policy exception, this case is a poor vehicle for finding sufficient evidence of an objective reasonable belief. The identified public policy in this case is certification from the fire department before an individual may service fire alarm systems. However, on more than one occasion the employee, Mr. David Ellis, informed his superiors that he would work on the system if he had written authorization from his superiors at Seattle Center. Thus, he would have engaged in the work he was directed to do regardless of any supposed belief in its illegality. Under these circumstances, I would conclude that he has not established an objective reasonable belief that public policy would be violated if he bypassed the fire relay.
While I do not agree with the majority's good faith belief standard, I nevertheless agree with the majority that there is a fact question as to whether an actual violation of public policy occurred. See majority at 1072. Accordingly, I would remand for trial with instructions in accord with this opinion.
For the reasons stated, I concur.
SANDERS, J., concurs.
NOTES
[1] Crary's note reads as follows:

Fire in kitchen in [sic] resulting in difficulty resetting fire panel. At this time best estimate is reset will take 1 + hours which is too close to doors
Matt Abraham is authorized by me to try to wire PA control around fire panel relays so we can proceed with set-up.
When panel is reset, Matt needs to resume control to fire panel relays.
Clerk's Papers at 334.
[2] The demand that Ellis follow orders no matter what is problematic as public policy. The following hypothetical illustrates the concern. Suppose an actual fire started during a crowded event at the Key Arena. On orders from a non-Fire Department person, Ellis then bypasses the PA automatic disabling switch, and Fire Department personnel are unable to issue evacuation instructions to the crowd, and loss of life and injuries ensue. Facing possible criminal and civil charges, Ellis attempts to exculpate himself by asserting he was only following orders, even though he knew he was not certified to work on the fire alarm system and believed such work to be unlawful. The "superior orders" defense failed elsewhere in history.

In 1813, Justice Bushrod Washington, sitting as a circuit justice, noted why obedience to unlawful orders of a superior need not be given, even in a military context:
The only remaining question of law which has been raised in this cause is, that the prisoner ought to be presumed to have acted under the orders of his superior officer, which it was his duty to obey. This doctrine, equally alarming and unfounded, Underwent an examination, and was decided by this court in the Case of General Bright [Case No. 14,647.] It is repugnant to reason, and to the positive law of the land. No military or civil officer can command an inferior to violate the laws of his country; nor will such command excuse, much less justify the act. Can it be for a moment pretended, that the general of an army, or the commander of a ship of war, can order one of his men to commit murder or felony? Certainly not. In relation to the navy, let it be remarked, that the 14th section of the law, for the better government of that part of the public force, which enjoins on inferior officers or privates the duty of obedience to their superior; cautiously speaks of the lawful orders of that superior. Disobedience of an unlawful order, must not of course be punishable; and a court martial would, in such a case, be bound to acquit the person tried upon a charge of disobedience. We do not mean to go further than to say, that the participation of the inferior officer, in an act which he knows, or ought to know, to be illegal, will not be excused by the order of his superior.
United States v. Jones, 26 F. Cas. 653, 657-58 (C.C.D.Pa.1813) (No. 15,494).
[3] The Court of Appeals chose not to consider the sections of the Seattle Fire Code Ellis cited in his brief, giving as a reason Ellis's failure to cite those sections to the trial court. Ellis, slip op. at 5. The court relied for its ruling on RAP 9.12, which provides, in part: "On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." The Court of Appeals' approach seems misguided. A fire code provision is not evidence; it is law. CR 56(h), of which RAP 9.12 is obviously a reflection, requires an order granting or denying summary judgment to "designate the documents and other evidence called to the attention of the trial court." There is no requirement to list every statute, code, or case brought to the attention of the trial court. Nor should there be, as any court is entitled to consult the law in its review of an issue, whether or not a party has cited that law.
[4] Human Resources Manager Cunningham berates Ellis for not sharing Captain Denzel's letter: "Had I been aware of this letter, I would have contacted the Fire Department to find out why the information Captain Denzel was providing appeared to be contradicting the information we had received from Captains Wick and Nelson that the temporary modification was permissible with Fire Department authorization. Since it was not shared, Seattle Center did not have reason to know of the conflicting information." Clerk's Papers at 439. If indeed Cunningham knew from Captains Wick and Nelson that the Fire Department would approve bypasses on a case-by-case basis, which is the precise information Ellis had been requesting, he should have shared it with Ellis at the fact-finding meeting.