146 P.3d 1242 (2006)
Rene WOODALL and the Public School Employees of Freeman, An affiliate of the Public School Employees of Washington, Appellants,
v.
FREEMAN SCHOOL DISTRICT, Respondent.
No. 24128-9-III.
Court of Appeals of Washington, Division 3.
November 21, 2006.
*1244 Elyse B. Maffeo, Public School Employees of Washington, Auburn, WA, for Appellant/Cross-Respondent.
Michael Early McFarland Jr., Attorney at Law, Spokane, WA, for Respondent/Cross-Appellant.
KULIK, J.
¶ 1 When the discharge of a public school employee is based on an alleged performance deficiency, the test to sustain the discharge is whether the deficient performance is remediable. The Freeman School District (District) discharged bus driver, Ms. Rene Woodall, based on its determination that Ms. Woodall violated district policy by letting a fourth grade student off at an incorrect bus stop. The court granted summary judgment in favor of the District but denied summary judgment on whether Ms. Woodall's conduct was remediable.
¶ 2 We agree with the court's denial of summary judgment on whether Ms. Woodall's conduct was remediable. But we also conclude there are genuine issues of material fact as to whether there was sufficient cause to terminate Ms. Woodall. We therefore reverse the court's grant of summary judgment in favor of the District.

FACTS
¶ 3 Public School Employees of Freeman (PSE) is the exclusive bargaining representative for classified employees of Freeman School District. PSE and the District have a bargaining agreement which provides that an employee may be discharged only upon a showing of sufficient cause.
¶ 4 Rene Woodall began her employment as a full-time bus driver for the District in December 1997. Ms. Woodall drove a regular bus route, No. 13, and an activity bus route known as the Hangman Activity Route. On Ms. Woodall's regular route she drove children from their bus stops to school and then returned them to their bus stops after school. On the activity route, Ms. Woodall drove children from school to a limited number of stops, when after-school activities were over.
¶ 5 When a child rode an activity route bus, his or her regular stop might not necessarily be a stop on the activity bus. Parents of students in the District were advised that activity bus stops might be different through an announcement in the North Palouse Journal that circulated before the school year began.
¶ 6 Each driver of a regular route was provided with a roster containing the names, ages, and bus stops of the children on the route. But no rosters were provided for the drivers of the activity routes because the riders on these routes changed on a daily basis. Instead, each student riding an activity bus was responsible for informing the driver of his or her activity stop. Hence, the driver of an activity bus had no information about whether the activity stop was different than the student's regular stop or whether the student was providing the correct information about his or her bus stop. Likewise, the driver of an activity bus had no information as to whether a student walked home from the activity bus stop or was picked up by a parent. Additionally, there was no express policy setting a minimum age below which students could not be unloaded from a bus without a parent present.
¶ 7 S.S. moved to Valleyford in the fall of 2003. He was in the fourth grade for the 2003-2004 school year. S.S. rode bus No. 12. A new bus stop was added to this route so that S.S.'s regular stop was directly in front of his home.
¶ 8 On April 19, 2004, S.S. was riding the activity route for the first time. Rene Woodall drove the bus. When S.S. boarded the bus, Ms. Woodall asked him where he needed to get off. S.S. answered "Stoughton." Ms. Woodall asked him where on Stoughton, and another student told her that "he rides bus No. 9 and lives at Stoughton and Valley Chapel. . . ." Clerk's Papers (CP) at 84. S.S. agreed when Ms. Woodall asked him if he rode bus No. 9 and lived down below Valley Chapel and Stoughton even though for seven months S.S.'s regular route had been bus route No. 12. Ms. Woodall did not drive route No. 12, her regular route was bus No. 13. However, Ms. Woodall was aware that *1245 there was a bus stop on No. 9 at Valley Chapel and Stoughton.
¶ 9 When Ms. Woodall approached Valley Chapel and Stoughton, she noticed that S.S. was looking around nervously. She asked him where he needed to get off the bus and he answered "Stoughton." CP at 85. S.S. told Ms. Woodall that he lived in Valleyford. Ms. Woodall tried to determine where on Stoughton S.S. lived by giving him the names of cross streets. S.S. told her that his bus stop was Madison and Stoughton. Ms. Woodall had already driven by this stop at the beginning of the route.
¶ 10 Because Madison and Stoughton was a stop at the beginning of the Hangman Activity Route, and because S.S. was able to identify his stop, Ms. Woodall decided that this situation should be treated as a missed stop on the activity run. She understood that, under District policy, the driver should contact the parents by phone and inform them of the time the child would be returned to the missed stop.
¶ 11 Ms. Woodall telephoned Everett Combs, the assistant transportation supervisor and left a message for him. Ms. Woodall then asked S.S. for his phone number and left a voice mail advising his parents that S.S. had first told her an incorrect bus stop, but that he had now told her his stop was Madison and Stoughton. Consequently, she would be dropping him off at 6:30 P.M. at the Valleyford Church parking lot.
¶ 12 S.S. did not inform Ms. Woodall that he was unsure how to get home or unsure about his stop. As a result, Ms. Woodall assumed that S.S. was mature enough to be allowed to walk home alone. She allowed him to get off the bus at a location approximately 80 feet from the designated Madison and Stoughton stop. S.S. asked whether he would have to walk home and then told Ms. Woodall that he "just lived down the road a little ways." CP at 19.
¶ 13 S.S.'s mother was unaware that activity bus stops were different from regular bus stops. She was waiting for S.S. to be dropped off in front of their house. At 6:15 P.M., S.S.'s mother went to a friend's house and learned that the stops on activity routes may not be the same as those on regular routes. S.S.'s mother then looked for S.S. and found him walking home.
¶ 14 The District terminated Ms. Woodall's employment based on the following: (1) failure to follow district policy and procedure by "dropping this child off" so far from his home and failure to return to the Transportation Facility with the student; (2) demonstrated lack of "follow through to ensure student safety"; and (3) unwillingness to recognize and follow District policy. CP at 20-21.
¶ 15 Ms. Woodall had seven years of satisfactory performance, positive evaluations, and no previous disciplinary actions.
¶ 16 PSE filed a grievance challenging this termination. The Freeman School Board of Directors denied the grievance, finding there was sufficient cause to terminate Ms. Woodall's employment. Ms. Woodall challenged this decision in superior court. The court granted summary judgment in favor of the District. However, the court found an issue of fact as to remediability. PSE and Ms. Woodall appeal. The District cross-appeals.

STANDARD OF REVIEW
¶ 17 When reviewing a summary judgment, this court undertakes the same inquiry as the trial court and considers all facts and reasonable inferences in the light most favorable to the nonmoving party. Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994). The court must determine whether a genuine issue of material fact exists; the court must not resolve an existing factual issue. Thoma v. C.J. Montag & Sons, Inc., 54 Wash.2d 20, 26, 337 P.2d 1052 (1959). A material fact is a fact upon which the outcome of the litigation depends. Morris v. McNicol, 83 Wash.2d 491, 494, 519 P.2d 7 (1974).

ANALYSIS
¶ 18 The question of whether an employee engaged in misconduct is a question of fact; the question of whether the employee's misconduct constitutes sufficient cause for discharge is a question of law. Wright v. *1246 Mead Sch. Dist. No. 354, 87 Wash.App. 624, 628, 944 P.2d 1 (1997).
¶ 19 In Clarke v. Shoreline Sch. Dist. No. 412, 106 Wash.2d 102, 112-13, 720 P.2d 793 (1986), the court considered whether a certified school employee's deficiencies in the classroom constituted sufficient cause for discharge. Clarke concluded that:
Sufficient cause for a teacher's discharge exists as a matter of law where the teacher's deficiency is unremediable and (1) materially and substantially affects the teacher's performance, or (2) lacks any positive educational aspect or legitimate professional purpose.
Id. at 113-14, 720 P.2d 793 (internal citations omitted).
¶ 20 The Clarke rule is now applied to both classified and certified employees. Butler v. Lamont Sch. Dist. No. 246, 49 Wash.App. 709, 715, 745 P.2d 1308 (1987). In Wright, this court concluded that remediability is not considered under the second prong of the Clarke rule. 87 Wash.App. at 630-31, 944 P.2d 1.
¶ 21 The trial court here granted summary judgment in favor of the District. Applying the first prong of the Clarke rule, the court concluded that there was an issue of material fact as to whether Ms. Woodall's conduct was remediable. But the court found no issue of material fact as to whether there was a deficiency in Ms. Woodall's performance or whether this deficiency materially affected her performance.
¶ 22 Even though the court found a question of fact under the remediability prong of the Clarke rule, the court dismissed Ms. Woodall's claims under the second prong and granted summary judgment to the District. The court concluded that there was no issue of material fact as to whether Ms. Woodall's conduct lacked any positive aspect of legitimate professional purpose, one of the factors in the second prong of the Clarke test.
1. Did the court view the facts in the light most favorable to Ms. Woodall?
¶ 23 On summary judgment, the court must consider all facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party. Ellis v. City of Seattle, 142 Wash.2d 450, 458, 13 P.3d 1065 (2000).
¶ 24 For purposes of its summary judgment motion, the District conceded that "[Ms.] Woodall's actions prior to dropping [S.S.] off were reasonable." CP at 135. The District also conceded that the initial miscommunication or misunderstanding as to S.S.'s stop was not attributable to Ms. Woodall. As a result, the inquiry here focuses on Ms. Woodall's actions when S.S. got off the bus at the Madison and Stoughton bus stop.
¶ 25 Taking the evidence in the light most favorable to Ms. Woodall, it is clear that: (1) while S.S. looked around nervously when the bus was approaching the Valley Chapel and Stoughton bus stop, during the time he was on the bus headed for Madison and Stoughton, he appeared calm; (2) when getting off the bus, Ms. Woodall asked if S.S. had far to walk and he responded that he "just lived down the road a little ways"; and (3) nothing in S.S.'s demeanor indicated that Madison and Stoughton was not his stop. CP at 19.
¶ 26 According to the District, Ms. Woodall dropped off 10-year-old S.S. knowing that he was nervous about unfamiliar surroundings. But this view of the facts is based on events occurring at the first incorrect stop at Valley Chapel and Stoughton, rather than the events at the second stop, Madison and Stoughton.
¶ 27 The District also suggests that Ms. Woodall knew that she was dropping S.S. off at the wrong stop. Throughout its brief, the District describes Ms. Woodall's conduct as dropping off a nervous 10-year-old 55 minutes late at a rural bus stop two miles from his house, without contacting his parents or the District. However, nothing in the record indicates that Ms. Woodall knew that S.S. got off at the wrong stop.
¶ 28 The court adopted the District's version of the facts and did not consider the facts in the light most favorable to Ms. Woodall. Moreover, as discussed below, there are issues of material fact as to whether the incident was covered by district policies, whether these policies had been communicated to the drivers, whether Ms. Woodall's *1247 performance was deficient, and whether there were facts establishing sufficient cause for termination.
2. Is there an issue of fact as to whether Ms. Woodall's job performance was deficient under the Washington Administrative Code (WAC) and District policies?
¶ 29 The scope of the inquiry as to whether there is sufficient cause for discharge is defined by the causes specified by the school board. Wojt v. Chimacum Sch. Dist., 9 Wash.App. 857, 860, 516 P.2d 1099 (1973). In its letter of termination, the District set forth three factors supporting its decision to terminate. The first factor dealt with Ms. Woodall's failure to follow District policy. Specifically, the letter stated:
(1) Failure to follow District policy and procedure by "dropping this child off' so far from his home and your failure to return to the Transportation Facility with the student until appropriate arrangements were made to insure that he was transported home safely. Your conduct and failure to follow District procedure placed a student in an unreasonable and unsafe situation. You have previously been advised of and were aware of this policy, and admitted this to us in our session with you. In addition to violating District policy, your conduct shows incredibly poor judgment.
CP at 20.
¶ 30 The District views this incident as a missed stop or a situation where a child was left on a bus at the end of the route. The District contends that in either of these situations, District policy required the driver to return to the Transportation Facility with the child.
¶ 31 But there is a question of fact as to whether the District had such a policy and whether this policy was communicated to the bus drivers. Also, there was no evidence that the bus drivers were provided with District policies or given any training concerning District policies. Charlotte Trejbal, the transportation supervisor, stated in her memorandum:
It is an unwritten rule, and common knowledge, that if you have a child left on the bus at the end of a route, you notify someone about the situation, or bring the child back to school, so some course of action can be taken to ensure the safety of the child.
CP at 27.
¶ 32 Significantly, evidence as to communications to the drivers concerning District policy when a student misses a stop is contained in driver meeting minutes from 1997. These minutes state:
If a driver should miss a stop, that driver needs to call the office to report which stop was missed and get approval for the appropriate way to return to the stop and the approximate return time so parents can be notified. If the missed stop is on the activity run, the driver should use the cell phone to contact the parents and inform them of the approximate time the student will be returned to the stop. Always reassure the student that he/she will be returned to the assigned stop. They are not to get off at another stop unless prior approval is received.
CP at 15 (emphasis added). This policy apparently assumes that the student will be taken to the missed stop and will be allowed to get off the bus. Ms. Woodall believed that she had returned S.S. to his correct stop.
¶ 33 In short, an issue of fact exists as to whether the District had policies, what those policies were, and whether those policies had been communicated to the drivers, including Ms. Woodall. Summary judgment cannot be based on assertions of an "unwritten rule" or "common knowledge."
¶ 34 There is also a question of fact as to how the incident here should be categorized. The District views this incident as a missed stop incident, but Ms. Woodall views this incident as a stop where a child misidentifies his stop and then corrects himself. Ms. Woodall maintains that under District policies, activity bus drivers were required to take students to the activity bus stop identified by the student. While S.S. was unsure of himself at the Valley Chapel and Stoughton stop, he subsequently corrected himself and asked to be taken to the Madison and *1248 Stoughton stop. Ms. Woodall argues that, taking the facts in the light most favorable to her, she took S.S. to "his" stop.
¶ 35 Contrary to the District's arguments, there is no policy that drivers must presume that students do not know their bus stop or that a special course of action must be taken if students misidentify their stop and later make a correction. In the absence of such policies, Ms. Woodall was justified in believing that Madison and Stoughton was S.S.'s stop. The District argues that there is a policy in these situations requiring the student to be released only to their parents. But the record shows that Ms. Woodall, and at least two other drivers, believed that the District policy allowed students in fourth grade and higher to be unloaded at a bus stop without a parent being present.
¶ 36 The District next maintains that Ms. Woodall's termination was justified because she violated WAC 392-145-015(7) and the exception set forth in WAC 392-145-020(7). Under WAC 392-145-015(7), "A school bus driver shall not order or allow a student to depart the bus other than at his or her boarding or alighting place except as provided in WAC 392-145-020(7)." The exception in WAC 392-145-020(7) provides: "A student may be permitted to leave the bus at other than his or her regular stop if permission is first obtained pursuant to district policy."
¶ 37 These provisions may not apply here because the Hangman Activity Route was not S.S.'s regular route, but was his regular activity route. In any event, Ms. Woodall refused to let S.S. disembark at the "wrong stop," but did allow S.S. to disembark at the stop he identified as the proper stop. In short, there is a question of fact as to whether Ms. Woodall violated these WACs and whether the WACs even apply to the facts here. The trial court erred by granting summary judgment on the issue of whether Ms. Woodall's conduct was deficient.
3. Did the court err by concluding that the District did not have sufficient cause to terminate Ms. Woodall under the first prong of the Clarke rule?
¶ 38 The District contends the trial court erred by concluding that Ms. Woodall's conduct was remediable. The trial court concluded that there were genuine questions of fact as to whether any deficiencies in Rene Woodall's job performance were remediable. The court examines remediability only under the first prong of the Clarke rule. According to the District, Ms. Woodall dropped off a 10-year-old student 55 minutes late at an unfamiliar rural location two miles from his home, without making contact with his parents or District personnel. In the District's view, Ms. Woodall refused to acknowledge the unacceptable nature of her conduct and she attempted to blame the incident on the student. The District points out that Ms. Woodall testified that, faced with the same situation, she would conduct herself in the same manner.
¶ 39 Conduct is remediable if it is reasonably correctable. Van Horn v. Highline Sch. Dist. No. 401, 17 Wash.App. 170, 176, 562 P.2d 641 (1977). Butler, 49 Wash.App. at 715, 745 P.2d 1308, held that the Clarke rule should be applied to certificated and noncertificated employees. Mr. Butler was a school bus driver who was terminated from his employment based on four incidents of deficient performance of his job duties: (1) driving a bus with an underinflated tire; (2) leaving a bus running and untended while in a loading zone; (3) driving at excessive speeds; and (4) failing to be in the immediate area when his passengers were loading. Id. at 710, 745 P.2d 1308. The court concluded that Mr. Butler's overall conduct, while inappropriate, did not constitute a material breach providing justifiable cause for discharge. Id. at 718, 745 P.2d 1308.
¶ 40 When reviewing this issue, this court views the facts in the light most favorable to Ms. Woodall. Ms. Woodall did not knowingly allow S.S. to disembark at a stop two miles from his home. Following District policies, Ms. Woodall allowed S.S. to disembark at the activity bus stop he identified as his stop. As a result, Ms. Woodall refused to acknowledge any deficiencies in her conduct. Significantly, Ms. Woodall had seven years of satisfactory performance, positive evaluations, and no previous disciplinary actions.
*1249 ¶ 41 Any deficient performance here may be remediable. The trial court correctly concluded that there was a question of fact as to remediability.
4. Did the court err by applying the second prong of the Clarke rule to Ms. Woodall's conduct?
¶ 42 Applying the first prong of the Clarke rule, the court ruled that there was a genuine issue of fact as to remediability. The court then applied the second prong of the Clarke rule, that Ms. Woodall's conduct lacked any positive educational or legitimate professional purpose. The court granted summary judgment in favor of the District, and dismissed the lawsuit.
¶ 43 The cases have drawn a distinction between a discharge based on job performance and a discharge based on clearly egregious misconduct. Clearly egregious misconduct includes sexual misconduct or exploitation of students by staff, or use of firearms on school property. Wright, 87 Wash.App. at 631, 944 P.2d 1; Wolf v. Columbia Sch. Dist. No. 400, 86 Wash.App. 772, 938 P.2d 357 (1997). Remediability is considered when the discharge is based on deficient performance, a professional shortcoming that can be remedied through means such as training, instruction, or more experience. Weems v. N. Franklin Sch. Dist., 109 Wash.App. 767, 776, 37 P.3d 354 (2002). However, remediability need not be considered when the employee's conduct lacks any positive educational aspect or legitimate professional purpose. Ruchert v. Freeman Sch. Dist., 106 Wash.App. 203, 211, 22 P.3d 841 (2001).
¶ 44 Here, Ms. Woodall's discharge was based on allegations of deficient performance. The trial court erred by dismissing this action based on the conclusion that Ms. Woodall failed to raise a genuine issue of material fact to establish that her conduct had educational or legitimate professional purpose.
¶ 45 The District refers this court to language in Ruchert stating that: "When the cause of action for dismissal is based on the employee's job performance, either one or both of the Clarke tests may apply." Ruchert, 106 Wash.App. at 213, 22 P.3d 841. Nothing in Ruchert requires that the court apply both tests here. Because the second prong of the Clarke rule does not apply here, this court need not address its application or the factors set out in Hoagland v. Mt. Vernon Sch. Dist. No. 320, 95 Wash.2d 424, 623 P.2d 1156 (1981). We hold that when the discharge of a public school employee is based on an alleged performance deficiency, the test to sustain the discharge is whether the deficient performance is remediable, the first prong of the Clarke test.
¶ 46 We affirm the court's decision on remediability and reverse its grant of summary judgment.
WE CONCUR: SWEENEY, C.J., and BROWN, J.