# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DAVID O'DEA, | No. 54240-4-II |
| Appellant, | |
| v. | |
| CITY OF TACOMA, a municipal subdivision of the State of Washington; and the TACOMA POLICE DEPARTMENT, an agency of the City of Tacoma, | UNPUBLISHED OPINION |
| Respondent. | |

GLASGOW, A.C. J.—Former Tacoma Police Department Lieutenant David O'Dea fired 11 shots at a car driven by Jose Manuel Mendoza Davalos as Mendoza Davalos was attempting to flee a group of officers. After an internal investigation, the Tacoma Police Department terminated O'Dea for violating the Department's use of force policy and exhibiting a lack of judgment that caused concern for community safety.

O'Dea argues the Department terminated him because he did not shoot directly at Mendoza Davalos and instead shot at the tires of the car, sparing Mendoza Davalos's life. O'Dea filed a complaint for damages against the City of Tacoma, alleging wrongful discharge in violation of public policy, in particular the public policy of preserving human life. He also alleged intentional infliction of emotional distress and negligent infliction of emotional distress. The trial court granted summary judgment in favor of the City.

The record shows that the Department terminated O'Dea because he discharged his weapon in a situation where the Department believed it was unreasonable and unnecessary to do so and

because O'Dea demonstrated a pattern of poor decision-making. Even viewing the evidence in the light most favorable to O'Dea, he cannot establish the causation element of a wrongful discharge claim by showing that public-policy-linked conduct caused his termination.

We therefore conclude that the trial court did not err when it granted summary judgment in favor of the City and dismissed O'Dea's wrongful discharge claim. The trial court also did not err when it granted summary judgment to the City on O'Dea's emotional distress claims. We affirm.

FACTS

In 2017, the Department terminated O'Dea. It found that he violated the Department's use of force policy by firing multiple shots at Mendoza Davalos's car when it was not an imminent threat to him. The Department also found that O'Dea's performance was unsatisfactory during and after this incident and that he carried a backup weapon without the necessary qualification. Former Tacoma Police Chief Don Ramsdell explained, however, that the "disciplinary decision would be the same even without the minor violations." Clerk's Papers (CP) at 151.

In his notice of intent to terminate, Ramsdell also considered that O'Dea initiated a pursuit on Halloween night 2015 that caused "a multi-vehicle collision resulting in significant injuries to citizens and substantial damage to property." *Id.* After that incident, the Department found that O'Dea's performance was unsatisfactory and that he violated Department policies relating to vehicle pursuits. The Department suspended O'Dea for 40 hours and notified him that "any further violation of the Tacoma Police Department Policies . . . may result in more severe discipline, up to and including termination of employment." CP at 210.

Ramsdell stated that his decision to terminate O'Dea after the shooting incident was "rooted [in] a reoccurring pattern of poor [judgment]," as well as O'Dea's repeated failure to take responsibility for his actions. CP at 151.

## I. USE OF FORCE INCIDENT

O'Dea responded to a call for assistance from Officer Edwin Huebner. Huebner was in the parking lot of an apartment complex in Tacoma investigating a possible traffic collision. Mendoza Davalos, who was one of the drivers involved in the incident, became angry with Huebner, backed into Huebner's patrol car, locked himself in his own car, and then refused to respond to officer commands.

Multiple officers were called to the scene. O'Dea, who was a supervisor, arrived soon after Officers Travis Waddell and Ryan Koskovich. O'Dea learned that Mendoza Davalos had "rammed" Huebner's patrol car. CP at 243. He saw Waddell and Koskovich with their guns drawn in a low ready position.

Mendoza Davalos called 911, and the officers attempted to communicate with him through dispatch, but he remained noncompliant. At one point, Mendoza Davalos told dispatch that if the officers did not move out of the way, he would run them over. The record suggests that at least some of the officers on scene heard dispatch relay this statement when it was made.

While O'Dea was speaking with Huebner, Mendoza Davalos began to drive. O'Dea saw the car "surge[] up over the . . . curb" in front of it and saw Waddell "violently move backwards," which caused O'Dea to believe that Waddell may have been hit by the car. CP at 262. Mendoza Davalos then reversed more forcefully into the car that had been parked next to him. That car was

pushed into the adjacent parking space, and Koskovich was forced to jump out of the way to avoid being hit.

O'Dea began to move away from Mendoza Davalos's car. He thought Mendoza Davalos was preparing to make a right turn toward the only exit in the parking lot, but then Mendoza Davalos turned the wheels back to the left and drove forward, putting O'Dea in the car's path. O'Dea saw the car accelerating "directly toward" him and believed that Mendoza Davalos was "trying to run [him] over." CP at 245. O'Dea recalled being five to seven feet in front of the car, "in [the] center of the vehicle," with the headlights equally distant from him. CP at 268. He "did not believe that [he] had enough time or distance to escape." CP at 246. O'Dea explained, "I knew he was going to kill me if I just stood there . . . . and if I continue[d] to move, he was going to kill me. He was going to hit me. I had to do something to change that dynamic." CP at 271.

O'Dea stated that he began moving to the right driver's side of the car, and he began firing shots toward the front of the vehicle, specifically the front left tire. O'Dea "determined [that his] best option would be to shoot at the vehicle and to get inside of Mendoza Davalos's OODA loop[1] [thought process], allowing [O'Dea] enough time to reach a [vehicle] to [his] right." CP at 246. O'Dea admitted he did not know where any of the other three officers were positioned, and he was concerned that firing at Mendoza Davalos would endanger their lives. He fired 11 times.

When O'Dea began firing, Waddell was running alongside the car and was forced to stop suddenly because he was "essentially running into [O'Dea's] line of fire." CP at 381. Waddell was within 10 to 12 feet of O'Dea when he began firing, and it took Waddell about 8 feet to decelerate

---

[1] "OODA" stands for "observe, orient, decide and act." CP at 270. It is a principle used to describe the decision-making process.

and stop running. Koskovich initially stated that he was not in danger of being hit, but he later expressed concern that he was in close proximity to O'Dea and bullet fragments were retrieved about 35 feet from where O'Dea had been firing. O'Dea admitted that he "had no clear idea" where Koskovich was when he started firing, but he claimed Koskovich was "not in the immediate vicinity" and "not in [his] line of vision at all." CP at 121.

Shortly after the shots were fired, Huebner was able to stop Mendoza Davalos's car by blocking it with his own car, and Huebner, Waddell, and Koskovich were able to remove Mendoza Davalos from the car and arrest him.

Huebner, Waddell, and Koskovich were interviewed multiple times after the incident. Huebner said that the car drove directly toward O'Dea "[a]t first," but then it "veered" away. CP at 354. He reported that O'Dea was out of the way and not in danger, but then O'Dea "stepped forward," toward the car, and began firing as the car was "passing by." CP at 618.

Waddell reported that O'Dea "jumped out of the way" and began to shoot. CP at 445. He said O'Dea was "kind of at the front and the side" of the car when he started firing, "about at a 45 to 60 degree angle from the vehicle," and the car was "brushing by him . . . while the shots were happening." CP at 381, 444.

On the night of the incident, Koskovich recounted that he observed O'Dea backpedal and fire "in the direction of the car as it's driving at him." CP at 368. Later on, during his Internal Affairs interview, Koskovich stated that O'Dea was "just off to the side of the vehicle . . . within a foot or two of the vehicle as he was firing" and that he fired as the vehicle was passing him. CP at 417. In an affidavit in support of the City's motion for summary judgment, Koskovich stated,

"When Lt. O'Dea fired his weapon, he was out of the way of Mendoza Davalos['s] car and not in imminent danger." CP at 633.

Mendoza Davalos pleaded guilty to third degree assault and third degree malicious mischief. In his guilty plea to the assault charge, Mendoza Davalos wrote, "I drove my vehicle in [O'Dea's] direction and he believed I was going to hit him with my car, causing him to attempt . . . to alter my vehicle's path by firing his gun . . . resulting in his gun's bullet fragments [bouncing] off my vehicle and strik[ing] O'Dea causing bodily injury." CP at 401. O'Dea had lacerations on his chin and left forearm and a contusion on his left forearm.

## II. POLICIES AND TRAINING

It is a guiding principle of the Department's use of force policy that "[t]he Tacoma Police Department recognizes and respects the value of all human life." CP at 465. The Department's "[p]rocedures and training are designed to resolve confrontations prior to escalation to the point deadly force may be applied." *Id.* (emphasis omitted).[2]

Officers "shall use only that force which is reasonable." CP at 457 (emphasis omitted). And an application of force is considered "[n]ecessary" if "no reasonably effective alternative to the use of force appeared to exist and . . . the amount of force used was reasonable to effect the lawful purpose intended." CP at 458 (emphasis omitted).

To review a use of force, the Department employs a "Reasonable Officer Standard," which it defines as a "[s]tandard of professional conduct relating to force application based on training, experience, facts and perceptions known to the [o]fficer at the time." CP at 458 (emphasis omitted).

---

[2] "Emphasis omitted" may also include "bold face omitted" when citing to clerk's papers.

The Department's policy allows for the use of "tools and tactics outside the parameters of departmental training," but officers must generally act consistently with departmental training. *Id.* (emphasis omitted). All uses of force outside of departmental training "shall meet the same standard of reasonableness as those which have been previously identified and approved." *Id.* Any "application of force must proportionally de-escalate or cease . . . when control is gained or [the] threat is removed." *Id.* (emphasis omitted).

The Department's policy considers the use of a firearm to be deadly force and indicates that it can only be used in response to life-threatening danger. "Deadly force should not be used against a subject in a moving vehicle unless it is necessary to protect against imminent danger to the life of the [o]fficer or others." CP at 465 (emphasis omitted). "When a law enforcement [o]fficer is pursuing a fleeing suspect, [they] may use deadly force only to prevent escape if the [o]fficer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the [o]fficer or others." *Id.*

The Department has trained officers that deadly force should not be used to stop a moving vehicle. Former Sergeant James Barrett, who developed and conducted use of force trainings for the Department and served as the Department's "firearm and use of deadly force subject matter expert," stated that he never trained officers to disable a vehicle with a firearm and that the proper tools for disabling a vehicle are spike strips and pursuit intervention techniques. CP at 582. He further stated that if a moving vehicle is posing an imminent threat to an officer's life, the "intended target should be the subject posing the threat," meaning the driver. CP at 583. Chief Ramsdell similarly emphasized that officers are not trained to shoot at moving vehicles—they can shoot at the subject, or driver, of a vehicle only as a last resort. *See* CP at 482-83. O'Dea's police practices

7

expert also admitted that he was "not aware of any such training that says shoot the tires of a vehicle." CP at 491. He stated that "in most cases [this tactic] is ineffective [because t]he vehicle just keeps driving." *Id.*

O'Dea agreed that the Department had not trained him to shoot to disable a moving vehicle, but he argued that he received "similar" training on how to shoot at a moving suspect and this circumstance was "not all that different." CP at 306. Moreover, O'Dea does not recall any training that specifically instructed officers *not* to shoot at the tires or engine block. O'Dea maintains that by using tools and tactics outside of the Department's models and training, he was able to preserve life in a deadly force situation. He argues, "If I could see another way [besides shooting at the driver himself,] . . . I should be allowed to exercise that [option]." CP at 109. In contrast, Ramsdell characterized the relevant question in this case as whether O'Dea was justified in shooting his gun *at all*.

### III. INVESTIGATION AND REVIEW

The incident triggered several layers of Department review. First, four of six members of the Deadly Force Review Board concluded that O'Dea's use of force was not reasonable and not within Department policy. This board is comprised of two management representatives, two union representatives, and two citizen representatives. The two management representatives recommended an internal investigation of possible policy violations.

Internal Affairs then investigated O'Dea on allegations of violating Department policies related to use of force, unsatisfactory performance, and equipment violations. Internal Affairs interviewed the three officers who were present during the shooting, three officers who showed up to assist after the shooting, several officers who were involved in forensic processing of the

8

evidence, the officer responsible for the Department's firearms training, and O'Dea himself. Internal Affairs sustained all of the allegations against O'Dea.

A Department detective who performed forensic analysis stated that "there were no defects located to the tire tread of the front left tire . . . the defects were from the side." CP at 165. He concluded that there was nothing to indicate that O'Dea was standing in front of the car when he began shooting and estimated that O'Dea was probably standing "in front of the door hinge, next to the door hinge, or behind it." *Id.* Another detective who analyzed the forensic evidence reported that the bullet strikes were "almost perpendicular to the wheel rather than from the front of the vehicle," and he believed O'Dea was standing "almost perpendicular, right at the left front wheel directly to the side of the vehicle as he was shooting." *Id.* He also noted "additional shots farther down the car." *Id.*

Internal Affairs relied on the forensic analysts' conclusions that O'Dea likely fired "while standing at the side of the vehicle" and stated that this "interpretation of the evidence coincided with Officers Huebner, Koskovich, and Waddell's statements that Lt. O'Dea was standing to the side of the suspect vehicle when he fired his weapon." CP at 173.[3]

Internal Affairs recognized that O'Dea believed Mendoza Davalos posed a significant danger, but it found that "O'Dea's determination to shoot at the vehicle's tire due to his fear of being struck by the suspect's car [was] negated by the fact that he was shooting at the tires of the vehicle as it was driving past him rather than driving towards him." *Id.* It found that he violated the use of force policy.

---

[3] The Internal Affairs report is in the record, but the City did not submit declarations or deposition testimony from the detectives who performed the forensic analysis.

In his complaint, O'Dea claimed that he provided a statement from a mechanic familiar with ballistic evidence and that he hired a forensic scientist to conduct a second inspection of the car, but the scientist was not permitted to remove the front left tire to examine it. According to O'Dea, the mechanic determined that there was damage "coming from the front of the vehicle traveling to the back of the vehicle." CP at 29. The record on appeal does not include any declaration or deposition testimony from the mechanic or the forensic scientist.

Internal Affairs also found O'Dea's performance was unsatisfactory due to his "poor decision[-]making." CP at 173. He failed to follow the Department's use of force policy, failed to inform dispatch and incoming officers that shots had been fired, and failed to follow other Department protocols after the shooting. He also violated the equipment policy because he did not have a current qualification to carry a backup handgun.

Internal Affairs noted O'Dea's 2015 suspension as well, which was imposed after the Halloween high-speed chase he initiated resulted in a collision and injuries, some serious, to members of the public, including children. Internal Affairs recommended termination, stating, "Lt. O'Dea has continued to make unsatisfactory decisions and his performance[] does not meet the standards expected of a Tacoma Police Officer, especially a Lieutenant." CP at 174. It concluded, "Lt. O'Dea does not model the behavior and actions expected of a seasoned law enforcement officer or commander. Lt. O'Dea's last two incidents have created a danger to himself, the officers around him, and the public." CP at 175.

Following a *Loudermill*[4] hearing where O'Dea and his union representative were permitted to speak, Chief Ramsdell accepted Internal Affairs' recommendation and terminated O'Dea. In a sworn affidavit, Ramsdell explained:

> I terminated Mr. O'Dea's employment because he violated the Tacoma Police Department use of force policy by using deadly force when it was not necessary or reasonable. When confronted with an actively resistant suspect who was trying to flee, Mr. O'Dea fired his weapon at the tires of the vehicle eleven times. At the moment Mr. O'Dea fired his weapon, the suspect vehicle was *passing* him and was not an imminent threat to either Mr. O'Dea or any of the officers present at the scene.
>
> . . . I understand that Mr. O'Dea is claiming that I terminated his employment because he did not shoot the driver of the vehicle, but instead aimed at the tires of the car – in other words, that I terminated his employment "because he decided not to shoot at and/or kill Mr. Mendoza-Davalos[.]" That is not why I terminated Mr. O'Dea. I terminated Mr. O'Dea from his position with [the Department] *because Mr. O'Dea never should have fired his weapon* under the circumstances. Although Mr. O'Dea states that he believed he was in imminent danger, a reasonable police officer facing the same circumstances would not have viewed the suspect as an imminent threat and would not have considered the use of deadly force necessary.
>
> . . . Another factor in my decision to terminate Mr. O'Dea's employment was a reoccurring pattern of poor judgment and his lack of accountability for his actions and decisions. In 2015, I suspended Mr. O'Dea for 40 hours for violating the Department's pursuit policy in an incident that resulted in a serious motor vehicle accident where multiple persons were injured. Despite a clear violation of the pursuit policy and significant discipline, Mr. O'Dea refused to take responsibility for this incident. Similarly, Mr. O'Dea continues to claim that his use of deadly force was not a violation of the use of force policy. His decision-making in both situations was dangerous and he is either unable or unwilling to admit it. Because of this, I have no reasonable basis to believe that he will not continue to exercise extremely poor judgment and engage in dangerous behavior, which ultimately puts the public and other officers at risk.

---

[4] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (due process requires providing some public employees with a "pretermination opportunity to respond").

CP at 141-42 (footnote omitted) (citation omitted). Ramsdell further explained in his notice of intent to terminate, "Although I appreciate [O'Dea's] perspective and opinions on what happened that day, I must base my decision on what I would expect a reasonable officer to do in that situation." CP at 148. He added, "While I do not believe in general, the use of deadly force was within policy, I also find that the decision to shoot at the tires was not within policy nor consistent with training." CP at 149.

O'Dea appealed to the Discipline Review Board, which unanimously upheld the termination.

## IV. O'DEA'S LAWSUIT AGAINST THE CITY

In 2018, O'Dea sued the City[5] for damages. He alleged wrongful discharge in violation of public policy, intentional infliction of emotional distress (outrage), negligent infliction of emotional distress, and defamation. The City filed a motion for summary judgment on all claims. In his response, O'Dea conceded that he could not establish defamation.

At a hearing on the motion, the trial court considered how shooting at a vehicle 11 times could endanger other officers and anyone nearby. The trial court explained,

> Whether or not the vehicle was headed for Mr. O'Dea or whether it had turned off before the discharge of the weapon or whether both things were true, the use of deadly force and firing off eleven rounds in an urban setting under these circumstances -- to discharge an officer on that basis does not, in my view, violate some kind of public policy. It advances public safety.

---

[5] The Tacoma Police Department is a department of the city of Tacoma and not a separate legal entity.

Verbatim Report of Proceedings at 20.[6] The trial court granted the City's motion for summary judgment on the remaining claims. O'Dea appeals.

ANALYSIS

I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56(c). "A genuine issue is one upon which reasonable people may disagree; a material fact is one controlling the litigation's outcome." *Youker v. Douglas County*, 178 Wn. App. 793, 796, 327 P.3d 1243 (2014). When determining whether a genuine issue of material fact exists, this court considers all evidence in the light most favorable to the nonmoving party. *Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 728, 452 P.3d 1205 (2019). If, after reviewing all the evidence, a reasonable person could reach only one conclusion, summary judgment is proper. *Id.*

If a defendant files a motion for summary judgment and shows an "'absence of evidence to support the [plaintiff]'s case,'" then the burden shifts to the plaintiff to set forth specific facts showing a genuine issue of material fact for trial. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); *see also M.E. & J.E. through McKasy v. City of Tacoma*, 15 Wn. App.

---

[6] O'Dea assigns error to the trial court "assum[ing] facts not in evidence when it suggested that Lt. O'Dea's 'random' shots placed other citizens in danger." Br. of Appellant at 2. The record does not identify specific citizens as endangered by O'Dea's actions, but Koskovich did describe the area as "busy." CP at 369. Regardless, O'Dea does not develop this argument in his brief, so we deem it waived. RAP 10.3(a)(6); *Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 713, 395 P.3d 1059 (2017) ("If an appellant's brief does not include argument or authority to support its assignment of error, the assignment of error is waived.").

2d 21, 31, 471 P.3d 950 (2020), *review denied*, 196 Wn.2d 1035 (2021). If the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" summary judgment is proper. *Young*, 112 Wn.2d at 225 (quoting *Celotex Corp.*, 477 U.S. at 322). We review the superior court's order granting summary judgment de novo. *Vargas*, 194 Wn.2d at 728.

## II. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

The Washington Supreme Court has recognized a cause of action in tort for wrongful discharge that "contravenes a clear mandate of public policy." *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). Generally, this tort arises in four specific scenarios: where an employee is fired for "refusing to commit an illegal act;" for "performing a public duty or obligation, such as serving jury duty;" for "exercising a legal right or privilege, such as filing workers' compensation claims;" or for "reporting employer misconduct, *i.e.*, whistleblowing." *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996). But a claim may exist outside of these scenarios if the plaintiff satisfies a four-part test. *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018) (affirming the use of the four-part "Perritt test" for cases that do "not fit neatly into one of those four recognized categories" (citing Henry H. Perritt Jr., *Workplace Torts: Rights and Liabilities* (1991))). "The plaintiff[] must prove the existence of a clear public policy (the *clarity* element)[,] . . . that discouraging the conduct in which they engaged would jeopardize the public policy (the *jeopardy* element)[,] . . . [and] that the public-policy-linked conduct caused the dismissal (the *causation* element)." *Gardner*, 128 Wn.2d at 941 (citing Perritt, *supra*, §§ 3.7, .14, .19). Finally, if the plaintiff satisfies the first three elements, then "[t]he

defendant must not be able to offer an overriding justification for the dismissal (the *absence of justification* element)." *Id.* (citing Perritt, *supra*, § 3.21).

This cause of action is a "narrow" exception to the at will employment doctrine. *Thompson*, 102 Wn.2d at 232. It is therefore the employee's burden to prove that their dismissal contravenes public policy. *Id.* Once an employee shows a violation of public policy, the burden shifts to the employer to prove that the dismissal was for legitimate, nonpretextual reasons. *Gardner*, 128 Wn.2d at 936. "This protects against frivolous lawsuits and allows trial courts to weed out cases that do not involve any public policy principle. It also allows employers to make personnel decisions without fear of incurring civil liability." *Thompson*, 102 Wn.2d at 232. The exception "should be applied cautiously so as to not swallow the rule" that employers generally need not explain their employment decisions to the courts. *Briggs v. Nova Servs.*, 166 Wn.2d 794, 802, 213 P.3d 910 (2009).

A.      Clarity Element

O'Dea claims his actions furthered the public policy of protecting human life. "The City does not dispute that society places a high priority on human life," and we agree. Br. of Resp't at 13.

The Supreme Court has previously recognized a public policy of prioritizing the protection of human life. It described this policy as "fundamental" and "clearly evidenced by countless statutes and judicial decisions." *Gardner*, 128 Wn.2d at 944.

In *Gardner*, the plaintiff was a "guard and driver of an armored car." *Id.* at 933. Gardner's employer had a company rule that if an employee left their armored car unattended for any reason, that was grounds for termination. *Id.* at 934-35. While in an armored car, Gardner saw a man

chasing a woman with a knife. *Id.* at 934. The woman screamed for help, and Gardner left the armored car to help her. *Id.* The Supreme Court held that Gardner could not be terminated for violating the company rule where the violation occurred "because he saw a woman who faced imminent life-threatening harm, and he reasonably believed his intervention was necessary to save her life." *Id.* at 950. The court recognized a "public policy encouraging such heroic conduct." *Id.*

The Supreme Court applied *Gardner* in *Ellis v. City of Seattle*, 142 Wn.2d 450, 13 P.3d 1065 (2000). There, a sound technician was discharged for "'gross insubordination'" after he refused his employer's order to disable part of an arena's fire alarm system without authorization to do so. *Id.* at 457. Ellis was "concerned about the potential danger to human life that might occur if he had to alter the designed operation of the fire alarm system," and the Supreme Court recognized that "[p]ublic policy should encourage the safe operation of fire alarm systems." *Id.* at 466.

The Department also "recognizes and respects the value of all human life" in its use of force policy. CP at 465. Officers are instructed that the need for deadly force "arises when there is no reasonable alternative," and they may apply deadly force only "as a last resort . . . to protect themselves or others." *Id.*

Protecting human life is a clear mandate of public policy. *See Gardner*, 128 Wn.2d at 950; *Ellis*, 142 Wn.2d at 466; *see also* CP at 465. O'Dea has satisfied the clarity element of the *Gardner* test.

B.    Jeopardy Element

O'Dea claims that by terminating him for shooting at the tires of the car, rather than at Mendoza Davalos, the Department jeopardized the public policy of protecting human life. If

O'Dea were fired because he chose not to shoot at Mendoza Davalos, as he asserts, then he could satisfy the jeopardy element.

The purpose of the jeopardy element is to ensure that "an employer's personnel management decisions will not be challenged unless a public policy is *genuinely* threatened." *Gardner*, 128 Wn.2d at 941-42 (emphasis added). To satisfy the jeopardy element, O'Dea must show that his "conduct *directly relate*[*d*] to the public policy, or was *necessary* for the effective enforcement of the public policy." *Id.* at 945. "Additionally, [O'Dea] must show how the threat of dismissal will discourage others from engaging in the desirable conduct." *Id.*

The decision not to shoot at another person directly relates to the public policy of protecting human life. If O'Dea were dismissed because he made the decision not to shoot at Mendoza Davalos, his termination would jeopardize the identified public policy. His dismissal might discourage other officers from choosing viable alternatives to shooting at suspects, and this would jeopardize the public policy of prioritizing the protection of human life.

C.      Causation Element

However, O'Dea's decision not to shoot at Mendoza Davalos was not the basis for O'Dea's termination. In briefing and in oral argument, O'Dea argued that he was terminated because he "chose not to shoot at or 'target' Mendoza Davalos when his actions threatened Lt. O'Dea's life." Br. of Appellant at 16. But O'Dea was not terminated because he chose to shoot at the tires, rather than shoot at Mendoza Davalos. Chief Ramsdell clearly stated that the Department terminated O'Dea because he chose to discharge his firearm at all, and O'Dea has not presented evidence to the contrary.

To satisfy the causation element, O'Dea "must prove that the public-policy-linked conduct caused the dismissal." *Gardner*, 128 Wn.2d at 941. O'Dea need not prove that this was the sole cause of his dismissal, but he must prove that it was a cause. *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991).

Ramsdell was explicit that he did *not* terminate O'Dea because O'Dea decided not to shoot at Mendoza Davalos. In Ramsdell's sworn affidavit, he stated, "I terminated Mr. O'Dea's employment because he violated the Tacoma Police Department use of force policy by using deadly force when it was not necessary or reasonable." CP at 141. Ramsdell concluded that O'Dea's use of force was not necessary or reasonable because O'Dea fired his weapon when the car was already passing him. He continued, "I terminated Mr. O'Dea from his position with [the Department] *because Mr. O'Dea never should have fired his weapon* under the circumstances." *Id.*

In his notice of intent to terminate, Ramsdell acknowledged that this was "a rapidly evolving situation" with a noncompliant individual and that, "at some point," O'Dea was in front of a moving vehicle. CP at 148. He acknowledged that O'Dea felt his own life was in danger and believed it was necessary to shoot to save himself. However, Ramsdell explained that "what matters when determining whether the use of deadly force was within policy is whether [O'Dea was] in imminent threat of death or serious bodily injury *at the time of the application of force*." CP at 149 (emphasis added). According to Ramsdell, the evidence was "clear" that when O'Dea

18

started shooting, he had already avoided being hit by the car, and he was not in imminent danger. *Id.*[7]

Ramsdell did express "serious concern" with O'Dea's decision to shoot at the tires because he did not see how this action would have stopped the vehicle from moving. *Id.* But this was a secondary concern. Both Ramsdell's sworn declaration and the Internal Affairs conclusions identified O'Dea's decision to use his firearm *at all* as the reason for his termination.

In addition, Ramsdell stated that "[a]nother factor in [his] decision to terminate Mr. O'Dea's employment was a reoccurring pattern of poor judgment." CP at 142. Ramsdell considered O'Dea's 2015 vehicle pursuit, which resulted in injuries to multiple people, and he noted that O'Dea never took full responsibility for his actions in that incident. Ramsdell concluded, "I have no reasonable basis to believe that [O'Dea] will not continue to exercise extremely poor judgment and engage in dangerous behavior, which ultimately puts the public and other officers at risk." *Id.*

There is no genuine issue of material fact regarding the cause of O'Dea's termination. The Department terminated O'Dea because it disapproved of his use of force. Ramsdell relied on the investigation conducted by Internal Affairs and concluded that when O'Dea fired his weapon, it was not reasonable or necessary. He also expressed concern that O'Dea had repeatedly violated Department policies and endangered others.

---

[7] Ramsdell reviewed the contrary evidence offered by O'Dea's mechanic, but he found that the mechanic conducted a different type of forensic analysis than the Department and, therefore, Ramsdell did not rely on the mechanic's analysis. The mechanic's analysis was not provided to the trial court, and it is not in this record.

While a reasonable person in Ramsdell's position might have reached a different conclusion or made a different decision under the circumstances, that is not the test for whether a prima facie case of wrongful discharge in violation of public policy has been established. This claim is a narrow exception to the employment at will doctrine, and it applies only where an employee is terminated for conduct that furthers an identified public policy.

O'Dea fails to satisfy the causation element of the *Gardner* test because his termination was *not* caused by the conduct that O'Dea claims is linked to the identified public policy—his decision to shoot at the car rather than Mendoza Davalos, thereby preserving Mendoza Davalos's life. It was caused by his decision to use his firearm at all. The Department did not terminate O'Dea for engaging in conduct that furthered the public policy of protecting human life; it terminated him because it believed that his conduct was unreasonable, unnecessary, and unsafe. Because O'Dea cannot establish this element of a wrongful discharge claim, his claim fails as a matter of law, and we must affirm the trial court's grant of summary judgment to the City.[8]

### III. ADDITIONAL TORT CLAIMS

O'Dea neglected to assign error in his opening brief to the trial court's dismissal of his other two claims, as required by RAP 10.3(a)(4). However, "[w]e have 'discretion to decide an issue a party fails to argue in its initial brief, especially where . . . the party raised it below and addresses it in a reply brief.'" *Ctr. for Biological Diversity v. Dep't of Fish & Wildlife*, 14 Wn. App. 2d 945, 978, 474 P.3d 1107 (2020) (alteration in original) (quoting *In re Recall Charges*

---

[8] Although we do not reach the absence of justification element, we note that O'Dea also failed to establish that the Department's justification for his termination was pretextual.

*Against Seattle Sch. Dist. No. 1 Dirs.*, 162 Wn.2d 501, 513, 173 P.3d 265 (2007)). We exercise our discretion to briefly address the arguments raised in O'Dea's reply brief.

A.     Negligent Infliction of Emotional Distress

O'Dea argues that his termination was a negligent infliction of emotional distress. But negligent infliction of emotional distress claims are not cognizable where they arise from employee discipline.

"Negligent infliction of emotional distress may be a cognizable claim in the workplace *when it does not result from an employer's disciplinary acts*." *Strong v. Terrell*, 147 Wn. App. 376, 387, 195 P.3d 977 (2008) (emphasis added). Generally, "employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." *Bishop v. State*, 77 Wn. App. 228, 235, 889 P.2d 959 (1995). This includes disputes that result in an employee's termination because "employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all," and "the courts cannot guarantee a stress-free workplace." *Id.* at 234.

Here, the Department's termination of O'Dea was a disciplinary action. O'Dea relies on *Cagle v. Burns & Roe, Inc.*, 106 Wn.2d 911, 726 P.2d 434 (1986), but that case does not address a stand-alone claim of negligent infliction of emotional distress. Instead, it considers "whether, and on what standard of proof," emotional distress damages are recoverable, should a plaintiff establish a claim of wrongful discharge in violation of public policy. *Id.* at 912. If O'Dea were able to prove the elements of his wrongful discharge claim, then he could also present an argument that emotional distress damages were warranted. But O'Dea is unable to establish a wrongful discharge

claim, and a separate cause of action for negligent infliction of emotional distress claim is not cognizable.

B.       Intentional Infliction of Emotional Distress (Outrage)

O'Dea also argues that "his termination was outrageous because he spared Mr. Mendoza Davalos' life." Appellant's Reply Br. at 11. We disagree.

To establish a claim of outrage, O'Dea must show "'(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress.'" *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 242, 35 P.3d 1158 (2001) (internal quotation marks omitted) (quoting *Birklid v. Boeing Co.*, 127 Wn.2d 853, 867, 904 P.2d 278 (1995)). "'The conduct in question must be *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*.'" *Birklid*, 127 Wn.2d at 867 (internal quotation marks omitted) (quoting *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989)). Whether certain conduct is sufficiently outrageous to establish an outrage claim is ordinarily a question for the jury, "'but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability.'" *Id.* (quoting *Dicomes*, 113 Wn.2d at 630).

Here, reasonable minds would agree that O'Dea's termination was not sufficiently extreme to establish liability. If O'Dea were correct that the Department terminated him for not shooting at Mendoza Davalos, then perhaps he would have an outrage claim. However, the Department thoroughly explained that it terminated O'Dea because he fired his weapon in a situation where the Department believed it was unreasonable, unnecessary, and unsafe to do so and because O'Dea

demonstrated a pattern of poor decision-making. Neither the Department's offered justification for his termination, nor its manner of terminating him, which involved extensive investigation and multiple levels of review, was so outrageous or extreme that it could be regarded as "'atrocious'" or "'utterly intolerable in a civilized community.'" *Birklid*, 127 Wn.2d at 867 (emphasis omitted) (internal quotation marks omitted) (quoting *Dicomes*, 113 Wn.2d at 630). Summary judgment dismissal of O'Dea's intentional infliction of emotional distress claim was proper.

## CONCLUSION

We affirm the trial court's grant of summary judgment on O'Dea's claims of wrongful discharge in violation of public policy, negligent infliction of emotional distress, and intentional infliction of emotional distress.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Maxa, J.

Sutton, J.